# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RASHAUD JONES,

    *Petitioner,*

    v.

UNITED STATES OF AMERICA,

    *Respondent.*

No. 3:19-cv-01305 (MPS)

## RULING ON § 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Rashaud Jones, *pro se*, seeks to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 on the grounds that: (1) law enforcement violated Jones's Fourth and Fifth Amendment rights during the investigation of his underlying offense and conviction; (2) the judicial system violated Jones's Fifth Amendment right to due process and protection against Double Jeopardy; and (3) his trial and appellate counsel rendered ineffective assistance of counsel. ECF No. 18. For the reasons set forth below, his motion is DENIED.[1]

---

[1] In his 2255 motion, Jones requests that I recuse myself on grounds of bias under 28 U.S.C. § 455, citing *In re Murchison*, 349 U.S. 133, 136 (1955). ECF No. 18 at 11. He identifies no factual basis for this request, and the case he cites, *In re Murchison*, is inapposite because that case involved a judge who acted as a "one-man grand jury" and later presided over a contempt hearing wherein the contempt charges arose out of that judge's role as a "one-man grand jury". *In re Murchison*, 349 U.S. at 133-34. To the extent Jones's request is based on my role adjudicating his underlying criminal trial, that does not provide a basis for recusal. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Balkany v. United States*, 751 F. App'x 104, 107-08 (2d Cir. 2018) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Further, as discussed in more detail below, Second Circuit precent expressly approves of trial judges relying on their familiarity with a petitioner's underlying criminal case in deciding a Section 2255 motion challenging the sentence in that same case. *See infra* Part III(A).

# I.    FACTUAL BACKGROUND

## A.    Initial Investigation

Over a period of several years, investigators developed information that Rashaud Jones, a.k.a. "Buck," was a large-scale crack cocaine trafficker in the City of Hartford.  Cooperating sources advised that Jones was dealing extremely large quantities of crack in the area of 17 Evergreen Street.  Investigators also had information tying Jones to 232 Westland Street, Hartford.  *United States v. Jones*, 3:13-CR-2-MPS, Presentence Report ("PSR"), ECF No. 312 ¶ 6.

In August and September 2012, agents periodically conducted surveillance of Jones at 17 Evergreen Street in Hartford and 71 Giddings Avenue in Windsor, Connecticut.  It appeared that Jones was residing with his girlfriend, Jenisha Nealy, at 71 Giddings Avenue and using 17 Evergreen Street as his stash and narcotics distribution location.  Investigators observed Jones meeting with numerous associates at 17 Evergreen Street.  Investigators observed Jones and his associates operate multiple cars, including a green Infiniti, a Chevy Tahoe, a Honda CRV, and rental vehicles.  Investigators observed Madeline Rivera and Charles Tyson meet with Jones at 17 Evergreen Street on numerous occasions.  It appeared that Jones would supply narcotics to Rivera and Tyson, who in turn would drive around in their car and conduct hand-to-hand narcotics transactions.  *Id.* ¶ 7.

Investigators identified one of Jones's narcotics trafficking associates as Tyrone Upshaw. On September 6, 2012, investigators observed Upshaw leave 17 Evergreen Street with a black plastic bag and drive away in the green Infiniti used by Jones and his associates.  Investigators conducted a motor vehicle stop of Upshaw and seized from the black plastic bag fifteen smaller bags of marijuana packaged for street sale and $2,033 in U.S. currency.  Investigators also seized

Jones's personal items from the green Infiniti, including a Visa Walmart card issued to Jones, a dental receipt that identified Jones's residence as 232 Westland Street in Hartford, a set of keys to a green Chevy Tahoe with the name "Buck" (which is the street name used by Jones) on the tag, and a Connecticut Light & Power bill for Jenisha Nealy of 71 Giddings Avenue, Windsor. *Id.* ¶ 8.

During the fall of 2012, investigators observed Jones at 71 Giddings Avenue. Based on physical surveillance, it appeared that Nealy and Jones were residing there. On November 26, 2012, investigators surveilled Jones and Nealy as they left 71 Giddings Avenue in the green Chevy Tahoe. Investigators conducted a motor vehicle stop of Nealy, Jones, and another associate in the green Chevy Tahoe. During the motor vehicle stop, Nealy identified her address as 71 Giddings Avenue and Jones identified his address as 232 Westland Street. Hartford Police Department records also identified 232 Westland Street as Jones's last known address. *Id.* ¶ 9.

### B.      Events of December 18, 2012

On December 18, 2012, at 8:35 a.m., investigators observed Jones leave 71 Giddings Avenue in a Dodge Magnum and drive to 232 Westland Street in Hartford. The Dodge Magnum is registered to Nealy and was observed operated by Jones and Nealy on prior occasions. Jones arrived at 232 Westland Street at approximately 8:45 a.m. Approximately five minutes later, Upshaw arrived in a rental vehicle at 232 Westland Street and then left a few minutes later. *Id.* ¶ 10.

Rivera called Jones at 8:56 a.m. to arrange to obtain crack cocaine from Jones. At approximately 9:25 a.m., Tyson and Rivera arrived at 232 Westland Street in the green Infiniti and parked behind the residence. Rivera and Tyson went to the second floor and obtained crack cocaine from Jones. Rivera said that Upshaw gave it to them in the apartment or brought it down

3

to their car.  At approximately 10:13 a.m., Tyson and Rivera drove away from 232 Westland Street in the green Infiniti.  Several minutes later, investigators conducted a motor vehicle stop of the green Infiniti for motor vehicle infractions.  *Id.* ¶ 11.

During the stop of the green Infiniti, investigators seized some marijuana from Tyson's front pocket and 51.3 grams of crack from a shoe box on the rear seat of the car.  An associate drove by the car stop.  In addition, while investigators were interviewing Rivera, a person identified on Rivera's cellular telephone as "King God Father" called Rivera twice.  Rivera testified that "King God Father" was the contact for one of Jones's cell phones.  Jones called Rivera's phone at 10:24 a.m. and 10:34 a.m.  *Id.* ¶ 12.

At 11:00 a.m., Jones called Dominic Castrucci, one of the owners of Metro Auto.  At 11:01 a.m., Jones called Metro Auto towing and arranged for the black Dodge Magnum to be towed from 232 Westland Street.  Shortly thereafter, Nealy arrived in the green Chevy Tahoe at 232 Westland Street and picked up Jones.  Investigators conducted a motor vehicle stop of the green Chevy Tahoe as it drove away from 232 Westland Street.  As investigators effected the stop, Jones called 911.  During the stop, investigators seized the following evidence: $4,230 from Jones; $4,816 from a backpack; three cellular telephones; Diamond Gold jewelry receipts; and a bank card.  *Id.* ¶ 13.

Investigators arrested Jones and transported him back to 232 Westland Street.  After advising Jones of his *Miranda* rights, law enforcement interviewed him.  Jones said that he lived on the second floor of 232 Westland Street and that he had not seen Rivera that day.  When pressed, Jones admitted that he had seen Rivera.  In addition, Jones said that Jenisha Nealy was just a friend and he did not know where she lived.  Meanwhile, Nealy told investigators that

Jones was her fiancé and that they lived together (i.e., at 71 Giddings Avenue in Windsor). *Id.* ¶ 14.

During the interview, Jones was fidgeting while looking at the black Dodge Magnum, which was on the back of a Metro Auto tow truck in the driveway at 232 Westland Street. According to a Metro Auto employee, a male named "Buck" called for the Dodge Magnum to be towed. Investigators knew Jones had driven the car that morning from 71 Giddings Avenue to 232 Westland Street without incident. Investigators told the Metro Auto tow operator to put the black Dodge Magnum back in the rear parking area. *Id.* ¶ 15.

Investigators knocked on the door to the second floor apartment at 232 Westland Street. After a short while, an older man answered the door. The older man identified himself as Jones's uncle. Based on his words and his actions, the older man appeared to be sleeping in one of the rooms in the apartment. During a security sweep of the apartment, investigators saw, in plain view on a table, a money counter. Investigators also received consent from Nealy to search 71 Giddings Avenue and observed an empty money counter box. *Id.* ¶ 16.

Investigators then obtained and executed a federal search warrant for the second and third floors at 232 Westland Street. The following evidence was seized from the second floor apartment: three knotted plastic bags containing 59.6 grams of cocaine; a shotgun shell; a box of Blazer .9mm ammunition; a black bag containing U.S. currency; a plastic bag containing numerous zip lock bags of marijuana; a plastic bag with numerous small elastic bands; empty zip lock bags; a cell phone; a Sprint bill in the name of Rasha[u]d Jones of 232 Westland Street; and a money counter. *Id.* ¶ 17.

Law enforcement then went to the rear parking area and looked inside the rear window of the black Dodge Magnum and observed an open bag that contained a box of ammunition.

Investigators searched the black Dodge Magnum and seized a Footlocker bag that contained the following evidence: two cookies of crack cocaine (a circular piece of approximately 4.5 ounces each); a loaded .22 Taurus revolver; a .9mm Hi-Point pistol; a Ruger 345 .45 caliber firearm; a loaded .45 caliber magazine; a loaded .9mm magazine; and two boxes of .40 caliber ammunition. Next to the Footlocker bag, investigators found a red and grey duffel bag that contained the following evidence: a knotted plastic bag containing a half a cookie (approximately 63 grams) of crack cocaine; three knotted plastic bags, each containing two cookies of crack; a vacuum sealed bag containing approximately 576.2 grams of compressed powder of suspected cocaine; a small digital scale; and men's clothing.  In total, investigators seized from the Magnum approximately 576.2 grams of cocaine and 935.5 grams of crack cocaine.  *Id.* ¶ 18.

C.     **Madeline Rivera's Testimony**

At trial, Rivera testified that she and Jones were extremely close.  Rivera testified that they had known each other for over 10 years and, during many times, they were together on a daily basis.  Rivera testified that they would refer to each other as "brother" and "sister."  Rivera also testified that Jones was her son's, King's, Godfather and that her son's christening was performed at Jones's mother's home.  This testimony was corroborated by Rivera's cell phone contacts (which identified Jones as "King God Father") and stored text messages.  *Id.* ¶ 19.

Rivera testified how she and Jones helped each other sell crack cocaine for many years. During the conspiracy period, Rivera referred crack customers to Jones and served customers on behalf of Jones.  Jones regularly provided between 28 and 63 grams of crack for Rivera to sell to her own customers.  Jones typically provided the crack to Rivera on credit.  Jones had Rivera rent cars for him and also had Rivera register the green Infiniti in her name.  Rivera was present when Jones cooked powder cocaine into crack at 232 Westland and 17 Evergreen.  Jones had

Rivera hold money – as much as $5,000 to $10,000 – for him.  Jones also stored his drugs in Rivera's apartment when he was concerned that things were getting too "hot" at his apartment. *Id*. ¶ 20.

Rivera testified regarding the scale of Jones's crack cocaine business.  On several occasions, Rivera went with Jones when he went to obtain kilogram quantities of cocaine from multiple sources of supply.  Rivera went with Jones when he went to obtain cocaine from sources of supply from several places, including Franklin Avenue in Hartford, Hartford's North End and New York City.  Jones discussed with Rivera the quality of the cocaine and the prices of cocaine, which were between approximately $34,000 and $42,000 per kilogram of cocaine. Jones cooked the powder cocaine into crack.  Rivera testified that Jones usually had between 4.5 and 9 ounces of crack on hand and Jones's larger customers obtained between 4.5 and 9 ounces of crack at time.  *Id*. ¶ 21.

Rivera testified that Jones helped support her.  Jones gave her cash and helped her pay bills.  Rivera testified that Jones was very close with her son, King, and helped support King. Rivera testified that Jones and Rivera would go shopping together, and Jones would buy things for Rivera.  *Id*. ¶ 22.

**D.     232 Westland Street**

The trial evidence showed that Jones maintained the apartment at 232 Westland Street, 2nd Floor, Hartford, from 2010 through 2013.  Rivera testified that the second floor apartment at 232 Westland Street was Jones's apartment during the relevant time period.  Rivera's testimony was corroborated by, inter alia, the following: a dental receipt; Connecticut Department of Motor Vehicle records; surveillance on December 18, 2012; Diamond Gold Connecticut records (which identified the residence as "232 Western Street"); Jones's post-*Miranda* statement to law

enforcement on December 18, 2012; the Sprint record seized from 232 Westland Street; the Connecticut state court document found on Jones's cell phone; and the money counter seized from 232 Westland Street (which matched the money counter box at 71 Giddings Avenue). *Id.* ¶ 23.

###### E.    The Dodge Magnum

The trial evidence demonstrated that the black Dodge Magnum belonged to Jones. Jones purchased the Dodge Magnum from Dominic Castrucci and registered the car in his then-fiancé's name. On December 18, 2012, Jones drove the car from 71 Giddings Avenue to 232 Westland Street. No one else was seen in the car. Jones parked the car in the rear of 232 Westland Street and the car remained in the lot until Jones called to get it towed. A search of Jones's cell phones showed that he had calls with Rivera in the morning and then called Rivera two times during the motor vehicle stop of Rivera's and Tyson's car. Shortly thereafter, Jones called Dominic Castrucci and Metro Auto towing to get the Dodge Magnum towed away from 232 Westland Street. *Id.* ¶ 24.

###### F.    Tools of the Trade

An FBI Special Agent provided testimony regarding the "tools of the trade" of crack cocaine dealers. During the trial, the Government offered substantial evidence regarding Jones's crack dealing activities and his use of "tools of the trade," which included the following:

- Multiple residences/locations: Jones lived at 71 Giddings Avenue, Windsor, and maintained apartments at 17 Evergreen Street and 232 Westland Street in Hartford. Jones used these apartments to facilitate and conduct his drug dealing. He used these locations to, among other things, process, stash, and/or distribute narcotics.

- Multiple vehicles: The trial evidence showed that Jones used numerous vehicles, including the green Infiniti, the green Chevy Tahoe, the black Dodge Magnum and numerous rental vehicles.

- <u>Rental cars & cars in other people's names</u>:  The trial evidence showed that Jones used multiple rental cars, including rental cars with CT, MA, and NJ plates. Rivera testified that she rented multiple cars for Jones.  Nealy also rented cars for him.  Jones also used cars that were registered in other people's names, including: the green Infiniti registered to Rivera; the green Chevy Tahoe registered to Kenneth Combs; and the black Dodge Magnum registered to Nealy.

- <u>Multiple cell phones</u>:  The trial evidence showed that Jones used at least three cell phones, including a personal phone, a phone for associates or established customers, and a "boost" or throw-away phone (without any listed contacts) for drug dealing activities.

- <u>Drug talk</u>:  Recovered text messages from Jones's throw-away phone show text communications that are consistent with drug dealing, including texts regarding, among other things: needing to talk business; wanting to "double up"; owing money; and arranging to get "a 20".

- <u>Counter-Surveillance</u>: Trial evidence revealed that Jones acted in a manner consistent with counter-surveillance, such as driving in an elusive pattern, driving into a dead end, abruptly changing direction, pulling u-turns, and pulling into a parking lot, stopping, and then pulling back out.

- <u>Delivery persons</u>:  Trial evidence showed that Jones used other persons to deliver narcotics to customers, who included Curtis Stevenson, Madeline Rivera, Tyrone Upshaw, and Janisha Nealy.

- <u>Look-out</u>:  The jury heard evidence that Curtis Stevenson served as a look-out for Jones.

- <u>Cash</u>:  Rivera testified that Jones often had cash (narcotics proceeds) on hand.  In addition, investigators seized $4,230 from his person, $4,816 from the backpack in the Chevy Tahoe, and $541 from 232 Westland Street.

- <u>Unexplained wealth</u>:  The trial evidence showed that Jones had considerable unexplained wealth, including the following: the use of three residences; the use of multiple vehicles; cash on hand; testimony that Rivera held as much as $5,000 to $10,000 for Jones; payment of cash to Dominic Castrucci for car work and to purchase the black Dodge Magnum; the purchase of jewelry; shopping for Rivera and himself; paying bills for Rivera and providing cash to Rivera; possession of $50,000-$60,000 (at the wholesale value) worth of cocaine and cocaine base; and possession of multiple firearms and ammunition.

- <u>Lack of legitimate income</u>:  Jones did not file any federal income tax returns for 2011 and 2012.  In addition, he had no reported wages to the Connecticut Department of Labor from the 4th Quarter of 2009 through 2012.  Rivera testified that Jones did not have a legitimate job and he earned his money through drug

dealing.

- Money Counter:  Investigators seized a money counter from Jones's apartment at 232 Westland Street, Hartford, and the box for the money counter from his residence at 71 Giddings Street, Windsor.

- Packaging material: Investigators seized 200 mini plastic bags and elastic bands from 232 Westland Street.

- Digital scale:  Investigators seized a digital scale from Jones's apartment at 232 Westland Street, Hartford.

- Firearms & Ammunition:  Investigators seized a shotgun shell and a box of Blazer .9mm ammunition from 232 Westland Street.  Investigators also seized a loaded .22 Taurus revolver, a .9mm Hi-Point pistol, a Ruger 345 .45 caliber firearm, a loaded .45 caliber magazine, a loaded .9mm magazine, and two boxes of .40 caliber ammunition, along with extremely large quantities of crack cocaine and powder cocaine, from the rear of Jones's black Dodge Magnum.

- Narcotics: Investigators seized crack cocaine from the rear of the green Infiniti that Jones had just provided to Rivera and Tyson.  In addition, investigators seized cocaine from Jones's apartment at 232 Westland Street and larger quantities of cocaine and crack cocaine from the rear of his black Dodge Magnum.

*Id.* ¶ 25.

### G.    Testimony of Michelle Hall

The defense called Michelle Hall to testify at trial.  Hall testified that she was being "nosy" on her back porch on December 18, 2012, and she observed Rivera put a "black duffle bag" and two shopping bags in the back of the Dodge Magnum.  Trial evidence revealed that the back porch was a significant distance from the rear of 232 Westland Street.  Hall testified that she didn't tell anyone about this for over 16 months.  Hall immediately identified the green Infiniti and the black Dodge Magnum, even though she had never seen them before or since the date in question (i.e., December 18, 2012).  Hall immediately identified Rivera and Tyson, even though she had never seen them before or since the date in question.  Hall testified that she was certain that she had a clear view of the back door and that Rivera and Tyson did not use keys to

enter the residence.  Trial evidence showed that it was impossible to view the back door of 232 Westland Street from Hall's porch.  Hall testified that she was certain that it was a "black duffle bag" and two shopping bags.  Hall also testified that there were no other cars in the back lot, besides the Dodge Magnum and the green Infiniti.  *Id.* ¶ 26.

## H.      Jones is a Convicted Felon

The parties stipulated that Jones was a convicted felon, who previously was convicted of a crime punishable by imprisonment for a term exceeding one year in Connecticut Superior Court.  *Id.* ¶ 27.

## I.      Firearms & Ammunition

The trial evidence showed that Jones possessed firearms and ammunition in connection with his narcotics trafficking activities.  Rivera testified that she had a conversation with Jones and Upshaw, during which they talked about a "pretty" gun.  Rivera said that Tyson, in an effort to ingratiate himself with Jones, obtained a couple of guns for Jones.  Rivera explained how she sat on a revolver in the living room area at 15 Evergreen Street on one occasion.  Rivera also testified that Jones showed Rivera a gun on one occasion and he was like a kid with a new toy. *Id.* ¶ 28.

On December 18, 2012, investigators seized from 232 Westland Street, among other evidence, a money counter, narcotics packaging materials, 59.6 grams of cocaine, a shotgun shell and a box of Blazer .9mm ammunition.  Investigators seized from the rear of the Dodge Magnum, among other evidence, the following: crack and powder cocaine (576.2 grams of cocaine and 935.5 grams of crack); a loaded .22 Taurus revolver; a .9mm Hi-Point pistol; a Ruger 345 .45 caliber firearm; a loaded .45 caliber magazine; a loaded .9mm magazine; and two boxes of .40 caliber ammunition.  *Id.* ¶ 29.

The trial evidence showed that the .22 Taurus revolver, the .9mm Hi-Point pistol, the Ruger 345 .45 caliber firearm, the Blazer .9mm ammunition, the .40 caliber Lawman ammunition, and the Winchester .45 caliber ammunition were manufactured outside of Connecticut and, as a result, had traveled in interstate commerce.  *Id.* ¶ 30.

## II.    PROCEDURAL BACKGROUND

On January 3, 2013, a grand jury returned an Indictment charging Jones with: conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846 (Count 1); possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count 2); possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count 3); possession with intent to distribute and distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count 4); unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 5); possession of a firearm in furtherance of a narcotics trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2) (Count 6); and unlawful possession of ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 7).  *Jones*, 13-CR-2, ECF No. 15; *see also id.* at ECF No. 160 (amended Indictment).

On October 31, 2013, Jones filed a motion to suppress evidence seized from the Chevy Tahoe, the Dodge Magnum, and the second floor of 232 Westland Street.  ECF No. 103.  On March 21, 2014, after a two-day evidentiary hearing held on December 12, 2013 and February 20, 2014, I denied Jones's motion to suppress in its entirety because

> (1) the investigators had probable cause to arrest Jones when they stopped the Chevy Tahoe, the search of his person was a valid search incident to arrest, and the owner of the Tahoe consented to the search of the vehicle; (2) even if the pre-warrant entry at 232 Westland Street is considered illegal—an issue the Court does not decide—the search warrant affidavit contains sufficient information—without the information obtained from the initial entry—to support a finding of probable cause to issue the warrant; and (3)

investigators had reasonable suspicion to prevent the tow truck driver from removing the Dodge Magnum from the scene, subsequent investigation gave them probable cause to search the vehicle, and a warrant was not required under the automobile exception to the warrant requirement.

*United States v. Jones*, No. 3:13-CR-2 MPS, 2014 WL 1154480, at *1 (D. Conn. Mar. 21, 2014), *aff'd*, 893 F.3d 66 (2d Cir. 2018), *and aff'd*, 738 F. App'x 13 (2d Cir. 2018).

From April 21 to 29, 2014, I presided over a jury trial (the "first trial") in the underlying criminal case. *See Jones*, 13-CR-2, ECF Nos. 154-55, 158-59, 163, 165, 168. On April 29, 2014, I declared a mistrial due to a deadlocked jury. *Id.* at ECF No. 168. On October 21, 2014, I presided over a second jury trial (the "second trial") but, due to an unexpected medical issue suffered by defense counsel, I declared a second mistrial and continued the second trial. *Id.* at ECF Nos. 236-37. From February 24 to March 2, 2015, I presided over the third and final jury trial (the "third trial") in this case. *Id.* at ECF Nos. 257-59, 262, 264, 267. On March 2, 2015, the jury returned guilty verdicts as to all seven counts against Jones. *Id.* at ECF No. 268. On January 5, 2016, I sentenced Jones to 151 months' incarceration on Counts One to Four; 120 months' incarceration on Counts Five and Seven to run concurrently; and 60 months' incarceration on Count Six to run consecutively for a total effective sentence of 211 months' incarceration and 5 years' supervised release. *Id.* at ECF No. 314. On January 8, 2016, Jones filed a timely notice of appeal of convictions with the U.S. Court of Appeals for the Second Circuit (the "Second Circuit").

On appeal, Jones argued that the Second Circuit should vacate his conviction because I erred by

(1) denying a motion to suppress evidence seized from a warrantless search of a car used by him; (2) denying his motion to suppress evidence seized from his apartment; (3) permitting a witness to testify regarding her drug-trafficking activities with Jones prior to the period charged in the indictment; (4) instructing the jury about inferences that they

13

could make if they found that Jones was the sole occupant of the car; and (5) applying a two-level Sentencing Guidelines enhancement for obstruction of justice.

*United States v. Jones*, 893 F.3d 66, 68 (2d Cir. 2018). The Second Circuit rejected each of Jones's arguments and affirmed his conviction and sentence. On June 19, 2018, the Second Circuit issued a written opinion explaining "why [I] did not err in refusing to suppress evidence seized from [the Dodge Magnum] . . . ." *Id.* On the same day, the Second Circuit issued a summary order rejecting Jones's remaining arguments. *United States v. Jones*, 738 F. App'x 13 (2d Cir. 2018).

Jones is currently confined at Federal Correctional Institution Elkton in Lisbon, Ohio.[2] Attorney Norman Pattis represented Jones as lead counsel during the first trial, sentencing, and the appeal to the Second Circuit. Attorney Francis O'Reilly represented Jones during the second and third trials as lead counsel.

On August 22, 2019, Jones filed an initial Section 2255 motion through his then-counsel, Attorney Norman Pattis. ECF Nos. 1-2. However, Attorney Pattis filed a motion to withdraw, Jones made clear that he intended to proceed *pro se*, and Jones asked me to strike the initial Section 2255 motion filed by Attorney Pattis on the ground that it was "defective." ECF No. 20 at 1. I denied as moot Jones's initial motion and made clear that I would not consider the claims and arguments in the initial motion or the Government's response to that motion. ECF No. 21. On November 25, 2019, Jones filed the operative Section 2255 motion. ECF No. 18. The Government filed its memorandum in opposition on February 24, 2020, ECF No. 22, and Jones filed his reply on March 17, 2020, ECF No. 23.

---

[2] *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited January 25, 2021).

## III.     LEGAL STANDARDS

### A.     Section 2255 Motion

Section 2255 permits collateral challenges to federal convictions.  28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.").  In deciding a Section 2255 motion, the court must hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* § 2255(b).  A petitioner is therefore not automatically entitled to a hearing, and no hearing is required "where the allegations are vague, conclusory, or palpably incredible.  To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues that, if proved at a hearing, would entitle [the petitioner] to relief." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal quotation marks and citations omitted); *see also Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) ("It is within the district court's discretion to determine whether a hearing is warranted [in a  Section 2255 case].").  In the context of a Section 2255 motion asserting an ineffective assistance of counsel claim, as Jones does, the Second Circuit has stated: "To warrant a hearing on an ineffective assistance of counsel claim, the [petitioner] need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted).  "If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made." *Id.*  But the court "need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214.

Further, in deciding a Section 2255 motion, the court "may properly rely on his or her knowledge of the record and may permissibly forgo a full hearing and instead request letters, documentary evidence, and affidavits to aid in its resolution of the claim." *Id.* at 215; *see also Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) (noting that Second Circuit precedent "permits a 'middle road' of deciding disputed facts on the basis of written submissions"); *United States v. Seiser*, 112 F.3d 507 (2d Cir. 1996) ("A district judge considering a section 2255 motion can rely on [his] personal familiarity with the case and dismiss the habeas claim without a hearing if []he finds that the petition lack[s] any truly meritorious allegation and there is overwhelming evidence of [petitioner's] guilt." (internal quotation marks omitted) (brackets in original)).

### B.      The Mandate Rule and Procedural Default

"Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted). "In the case of a collateral challenge based on constitutional claims, two separate rules regarding claim preclusion based on a prior adjudication apply[:]" the mandate rule and procedural default. *Id.* A Section 2255 motion "may not relitigate issues that were raised and considered on direct appeal." *United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997). "Th[is] mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui*, 614 F.3d at 53. The mandate rule "bars the raising in a habeas proceeding of a claim when the events underlying the claim were the same as those underlying a

claim raised and decided on the merits on direct appeal." *Id.* at 56.

Procedural default "prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice." *Id.* at 54; *see also Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) ("[A] collateral challenge may not do service for an appeal. Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that he is actually innocent." (internal citations and quotation marks omitted)). "In order to demonstrate cause, a defendant must show some objective factor external to the defense such that the claim was so novel that its legal basis [was] not reasonably available to counsel." *Id.* (internal quotations marks and citations omitted). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, *or failed to raise the claim despite recognizing it*, does not constitute cause for a procedural default." *Id.* at 85 (emphasis in original). A successful claim of ineffective assistance of counsel can satisfy the "cause" standard. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *see also Yick Man Mui*, 614 F.3d at 57 ("[T]he only barrier to raising ineffective assistance claims in a Section 2255 proceeding after raising such claims on direct appeal is the mandate rule, i.e., strategies, actions, or inactions of counsel that gave rise to an ineffective assistance claim adjudicated on the merits on direct appeal may not be the basis for another ineffective assistance claim in a Section 2255 proceeding.").

### C.    Ineffective Assistance of Counsel

To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The performance prong of the

two-part *Strickland* test requires a showing that "counsel's representation fell below an objective standard of reasonableness," in light of "prevailing professional norms." *Strickland*, 466 U.S. at 688. To satisfy the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In applying this standard, a reviewing court must make every effort . . . to eliminate the distorting effects of hindsight and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy." *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005) (internal quotation marks omitted) (brackets in original).

## IV.   DISCUSSION

Jones's *pro se* motion raises four primary arguments. First, Jones alleges that the stop of the Chevy Tahoe and his detention and transportation to 232 Westland Street were unlawful and, as a result, all evidence seized after the traffic stop must be suppressed. *See* ECF No. 18 at 2-5. Second, Jones alleges that the Dodge Magnum was within the curtilage of his residence at 232 Westland Street and the evidence seized from the Dodge Magnum should therefore be suppressed. *Id.* at 5-8. Third, Jones argues that the Double Jeopardy clause, which incorporates the doctrine of collateral estoppel, should have precluded any retrial after the first trial was declared a mistrial. *Id.* at 9-11. Fourth, Jones raises various ineffective assistance of counsel claims related to trial and appellate counsel in his criminal case based on the alleged deficiencies he identifies in his 2255 motion. *See* ECF No. 18. Lastly, Jones seeks an evidentiary hearing, appointment of counsel, and Rule 6 discovery. *Id.* at 12-13. For the reasons discussed below, I find that each of Jones's claims lacks merit and therefore I must deny his motion in its entirety.

### A.    The Officers Lawfully Stopped the Chevy Tahoe and Arrested Jones.

Jones's first set of arguments concern the December 18, 2012 traffic stop initiated by Detective Campbell.  Jones argues that: (1) there was no "judicial warrant" to justify law enforcement stopping the Tahoe, *id.* at 3; (2) he was not arrested and, as a result, there was no basis to conduct a search incident to arrest, *id.* 2; (3) he was illegally detained and transported to 232 Westland Street, *id.* at 3; and (4) his *Miranda* rights were violated when Detective Campbell allegedly denied Jones the opportunity to contact his attorney, Robert Pickering, *id.* at 3-4. Because of these alleged violations, Jones argues that all evidence seized after the traffic stop of the Tahoe must be suppressed under the exclusionary rule.  I disagree.

As an initial matter, Jones's challenge to the search of the Chevy Tahoe and his subsequent arrest is barred by the mandate and procedural default rules.  The mandate rule bars Jones's challenge as to the Tahoe here even though he did not expressly raise such a challenge in his direct appeal because the Second Circuit upheld the denial of the motion to suppress in its entirety, including with respect to the stop of the Tahoe and Jones's subsequent arrest.  *See United States v. Jones*, 893 F.3d 66 (2d Cir. 2018) (holding that the district court did not err in denying Jones's motion to suppress evidence seized from a warrantless search of the Dodge Magnum); *id.* at 69 (noting that "[a]t approximately 10:30 a.m., the officers observed Jones leave 232 Westland Street as a passenger in a Chevy Tahoe. The officers stopped the Tahoe, arrested Jones, recovered approximately $4,000 from his person, and brought him back to 232 Westland Street.  With consent from the registered owner of the Tahoe, officers searched the vehicle and recovered an additional $4,400."); *United States v. Jones*, 738 F. App'x 13 (2d Cir. 2018) (holding that the district court did not err in denying Jones's motion to suppress evidence seized from his apartment at 232 Westland Street).  Because the events underlying Jones's challenge

regarding the Tahoe were the same as those underlying the suppression challenges he raised –

and were decided – on appeal, the mandate rule bars his challenge.  *Yick Man Mui*, 614 F.3d at

56.

      Further, as the Government notes, ECF No. 22 at 22 n.1, to the extent that Jones now

raises suppression-related issues that were not explicitly or impliedly raised and decided on

direct appeal, he has procedurally defaulted these claims.  *See Gupta*, 913 F.3d at 84; *Yick Man*

*Mui*, 614 F.3d at 53-56.  The claim he now makes with respect to the stop of the Tahoe and his

arrest is based on alleged factual predicates that were known to Jones at the time of his appeal

and thus could have been raised on direct appeal.  *Marone v. United States*, 10 F.3d 65, 67 (2d

Cir. 1993) ("In order to raise a claim that could have been raised on direct appeal, a § 2255

petitioner must show cause for failing to raise the claim at the appropriate time and prejudice

from the alleged error.").  In addition, Jones has not alleged anything that could constitute

"cause" sufficient to excuse the procedural default.  *See Gupta v. United States*, 913 F.3d at 84-

85; *see also Marone*, 10 F.3d at 67 ("'[C]ause' under the cause and prejudice test must be

something external to the petitioner, something that cannot be fairly attributed to him.

Furthermore, [a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the

petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner

must bear the risk of attorney error." (internal quotation marks and citations omitted)).[3]

      But even if Jones's challenge to the stop and search of the Tahoe and Jones's arrest were

not barred by the mandate rule or procedural default, it would still fail for the reasons stated in

my order denying Jones's motion to suppress and as affirmed by the Second Circuit.

Specifically, I found that (for reasons explained in greater detail in the order denying Jones's

---

[3] I address Jones's ineffective assistance of counsel claims in Part IV(D) below.

motion to suppress and quoted at length in the Government's brief, *see* ECF No. 22 at 19-21): (1) the officers had probable cause to stop the Chevy Tahoe and arrest Jones based on the statements of Tyson and Rivera and the crack cocaine seized from the green Infiniti, coupled with the other evidence obtained by investigators through their investigation; (2) Jones was arrested for the purposes of the Fourth Amendment, regardless of Jones's claim that officers told him otherwise, and the subsequent search of Jones's person was justified as a search incident to arrest; (3) investigators were entitled to search the Tahoe because the registered owner (Combs) and driver (Nealy) consented to the search; and (4) Jones's *Miranda* rights were not violated because, to the extent his testimony conflicted with that of Detective Campbell on this point, I credited Detective Campbell's testimony.  *See Jones*, 2014 WL 1154480, at *5, 7-9, 11 n.8.[4]

Jones's reliance on the Second Circuit's decision in *United States v. Bailey* does not help his argument because *Bailey* is distinguishable from the facts here.  Whereas *Bailey* involved a *Terry* stop and the detention of Bailey – which the district court judge found was *not* an arrest under the Fourth Amendment – and whether the police exceeded the reasonable scope of a *Terry* stop, here I found that the police did have probable cause to arrest Jones (and did arrest Jones under the Fourth Amendment) when they pulled over the Tahoe and that the search of the Tahoe itself was consented to.  *See United States v. Bailey*, 743 F.3d 322, 328 (2d Cir. 2014).  As a result, the evidence seized after the traffic stop of the Tahoe should not have been suppressed and Jones's Section 2255 motion is denied as to the seizure and search of the Chevy Tahoe and Jones.

### B.    The Officers Lawfully Searched the Dodge Magnum.

Next, Jones argues that the Dodge Magnum parked at 232 Westland was protected by the

---

[4] I consider Jones' claim that Detective Campbell denied his request to speak with his attorney, Robert Pickering, in Part IV(E) below.

Fourth Amendment because it fell within the home's "curtilage" and therefore the evidence seized from the Dodge Magnum should be suppressed.  ECF No. 18 at 2, 5-8.  Specifically, Jones argues that the Dodge Magnum was out of public view and challenges the "shared driveway" theory to suggest that he had a heightened expectation of privacy where the Magnum was parked.  *Id.*  Jones asserts that the "automobile exception" to the Fourth Amendment's warrant requirement thus does not apply, and further objects to Detective Campbell's testimony that he observed the box of ammunition when he looked through the car's rear window.  *Id.* at 6. Because these arguments were fully briefed and litigated by the parties before me and the Second Circuit, I find that Jones's challenge to the search of the Dodge Magnum is barred by the mandate rule.

Specifically, I denied Jones's motion to suppress evidence seized from the Dodge Magnum because "investigators had reasonable suspicion to prevent the tow truck driver from removing the Dodge Magnum from the scene, subsequent investigation gave them probable cause to search the vehicle, and a warrant was not required under the automobile exception to the warrant requirement."  *Jones*, 2014 WL 1154480, at *1.  On appeal, the Second Circuit issued a precedential opinion with respect to Jones's challenge related to the Dodge Magnum and held that "that the officers had probable cause to search the Dodge Magnum and that the automobile exception applies because Jones had no heightened expectation of privacy in a vehicle parked in a multi-family parking lot.  The district court therefore did not err in admitting evidence recovered from the vehicle search."  *Jones*, 893 F.3d at 71.  In considering Jones's challenge with respect to whether the Magnum was parked within the home's curtilage, the Second Circuit held that the vehicle was not within the curtilage of Jones's home because the lot was "a common area accessible to other tenants of 232 Westland Street and to tenants of a multi-family

building next door, and therefore Jones could not reasonably expect that it should be treated as part of his private home." *Id.* at 72.  The Second Circuit further held that "there was sufficient evidence for the district court to conclude that the officers had probable cause" even excluding Detective Campbell's testimony that he observed a box of ammunition in the Magnum through the rear window.  *Id.* at 71.  As a result, Jones's challenge to the Dodge Magnum is barred by the mandate rule and his Section 2255 motion is denied as to the search of the Dodge Magnum.  *See Yick Man Mui*, 614 F.3d at 53; *Perez*, 129 F.3d at 260.

  **C.**  **Jones's Retrial Did Not Violate the Double Jeopardy Clause.**

   Jones also argues that "[c]ollateral estoppel should have prevented the Government from obtaining a second bite at the appeal as a penumbra of the Double Jeopardy Clause."  ECF No. 18 at 9.  To be sure, the Supreme Court has held that "the Double Jeopardy Clause incorporates the doctrine of collateral estoppel in criminal proceedings."  *Schiro v. Farley*, 510 U.S. 222, 232 (1994).  But collateral estoppel, or issue preclusion, applies only "when an issue of ultimate fact has once been determined by a valid and final judgment . . . ."  *Id.*  Here, no ultimate fact was determined by any final judgment in Jones's first or second trials because both were declared to be mistrials.  *See id.*  In addition, the Government correctly notes that where, as here, a jury is unable to reach a decision, that constitutes the type of "manifest necessity" that permits a trial court to declare a mistrial and preside over a new trial without placing the defendant in jeopardy twice.  *See Renico v. Lett*, 559 U.S. 766, 773 (2010) ("[W]hen a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury." (citing *United States v. Perez*, 22 U.S. 579 (1824))).  Thus, Jones's Section 2255 motion is denied as to his challenge under the Double Jeopardy Clause.

**D.     Jones's Trial and Appellate Counsel Did Not Render Ineffective Assistance of Counsel.**

Throughout his motion, Jones makes a number of claims that are, or appear to be, claims that his trial or appellate counsel rendered ineffective assistance of counsel under the Sixth Amendment, although these claims are not well developed.  Specifically, Jones argues that his trial counsel rendered ineffective assistance for failure to: (1) "introduce[] aerial photos in conjunction with the metes and bounds description associated with 232 Westland Street" in support of his curtilage argument and challenge related to the Dodge Magnum, ECF No. 18 at 6; (2) "introduce[] video evidence demonstrating the degree of tinting on the Dodge Magnum as dispositive evidence" in support of his challenge to Detective Campbell's testimony that he saw ammunition in vehicle through the rear window, *id.* at 7; (3) "obtain [and introduce as evidence at the suppression hearing] Detective Campbell's phone records . . ." in support of Jones's challenge under *Edwards v. Arizona*, 451 U.S. 477 (1981) and the Second Circuit's decision in *Bailey* to the stop of the Tahoe and his subsequent arrest, ECF No. 18 at 4; and (4) object and preserve a claim under the Double Jeopardy clause and collateral estoppel, *id.* at 9-11.  In addition, Jones argues that his appellate counsel rendered ineffective assistance for failure to: (1) "challenge the 'shared driveway analysis' by distinguishing the facts and law on direct appeal", *id.* at 6; (2) provide a Rule 28(j) letter "particularized to Jones's facts" based on the Supreme Court's decision in *Collins v. Virginia*, 138 S. Ct. 1663 (2018), ECF No. 18 at 8; and (3) raise a *Bailey* challenge, *id.* at 4.  I disagree and find that Jones's trial and appellate counsel did not render ineffective assistance in violation of his Sixth Amendment rights.

With the exception of Jones's third claim against his trial counsel regarding Detective Campbell's phone records, each of Jones's ineffective assistance claims are either barred by the mandate rule or fail to demonstrate prejudice under *Strickland*, or both.  "[T]he mandate rule []

bar[]s ineffective assistance claims in a Section 2255 proceeding when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate." *Yick Man Mui*, 614 F.3d at 53.  Though Jones did not raise ineffective assistance of counsel claims on direct appeal, he did raise objections based on the factual predicates of these claims that were considered and rejected by the Second Circuit as discussed above.  In addition, Jones cannot establish that his trial or appellate counsel's performance failed to meet *Strickland*'s performance standard or that he suffered any prejudice based on these claims.  Aerial photos showing the metes and bounds of 232 Westland Street would have made no difference because the Second Circuit's holding – that the driveway where the Dodge Magnum was parked was not curtilage – was based on the fact that both 232 Westland Street and the adjacent building are *multi-family* homes and, as a result, he had no expectation of privacy in a multi-family parking lot.  *Jones*, 893 F.3d at 71.  Likewise, video evidence showing the extent of tinting of the Dodge Magnum cannot establish prejudice because the Second Circuit found there was sufficient probable cause to search the Dodge Magnum even without Detective Campbell's testimony that he saw a box of ammunition through the rear window.  The Second Circuit also expressly considered and rejected Jones's challenge to the "shared driveway analysis" as well as the Supreme Court's holding in *Collins*.  Thus, his appellate counsel did not render ineffective assistance based on these claims.  Jones also cannot demonstrate any prejudice based on his trial counsel's failure to preserve an objection under the Double Jeopardy clause or his appellate counsel's failure to raise a challenge under *Bailey* because these legal claims lack merit for the reasons I discuss above.  Lastly, Jones cannot demonstrate ineffective assistance of counsel related to his trial counsel's failure to obtain and introduce Detective Campbell's phone

records for reasons I discuss in greater detail below.  Thus, Jones's Section 2255 motion is denied as to his ineffective assistance of counsel claims.

### E.    An Evidentiary Hearing is Not Warranted.

Jones's claim for an evidentiary hearing rests primarily on the idea that, after his arrest and transportation to 232 Westland Street on December 18, 2012, Jones made a request to speak to his lawyer, Robert Pickering, that the officer refused that request, and that he could prove this if given the chance to obtain the officer's cell phone records (because, Jones says, the officer initially placed the call and then hung up) via Rule 6 discovery.  ECF No. 18 at 3-4.[5]  Jones claims that this was a violation of *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that once a suspect invokes his right to counsel under *Miranda*, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").  Even if Jones's allegations in his declaration are true, they would not entitle him to any relief here.

Specifically, Jones recites the following in his declaration:

After being detained and transported back to 232 Westland Street [on December 18, 2012], I continued to inquire as to my arrest status. Upon being informed that I was not under arrest, I requested that I be allowed to contact Robert Pickering, Attorney at Law. Initially, I was flatly denied, but the officers continued to question me about 232 Westland Street. At that time, I invoked my right to remain silent and requested to use my phone to contact my attorney. I did not, at any time, make any statements to the police.

Detective Campbell then came to the police car that I was sitting in and started asking questions. I asked him if I could use my phone to make a call. He said no, but that he would make a call for me. He asked who I wanted to call and I said a friend. He asked what's the number. I said: 8-6-0-9-8-2-5-2-9-7. After Detective Campbell realized that he

---

[5] To the extent Jones seeks an evidentiary hearing as to the other issues discussed above, I find that an evidentiary hearing is not warranted because he has not "set forth specific facts supported by competent evidence, raising detailed and controverted issues that, if proved at a hearing, would entitle [Jones] to relief", *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal quotation marks and citations omitted), and because he has not "establish[ed] . . . that he has a plausible claim of ineffective assistance of counsel . . .", *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted).

called the law office of Robert Pickering, he hung up the phone and remarked 'nice . . . really cute.'

After the afore-described interchange, I asked 'what about the right to call my attorney?' Detective Campbell told me that I was not under arrest. I said, 'If I'm not under arrest, then why am I being held in this police car?' Detective Campbell responded 'that I was being detained pending investigation.' I responded, 'Investigation of what . . . do you even have a warrant?' He responded that we have all we need at this time. I asked, 'Why are you in my apartment and property?'

Next, I told Detective Campbell to 'release me or let me call my attorney.' He just slammed the car door in my face.

ECF No. 18 at 16-17.  Jones maintains that he did not say anything to Detective Campbell during this questioning.  By contrast, Detective Campbell testified – testimony that I credited – that Jones stated he lived on the second floor of 232 Westland Street, that Jones had not seen Rivera that day, and that Jones does not have anything on the third floor of 232 Westland Street.  *See Jones*, 2014 WL 1154480, at *11.  Detective Campbell used those three statements in his application for a warrant to search 232 Westland Street.  *See id.* at *10-12.  But because the warrant would have been sufficiently supported by probable cause even without these statements, Jones cannot show that he suffered any prejudice based on his factual allegations, even if they are true.  *See United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) ("The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." (internal quotation marks omitted)).

Indeed, as my ruling denying Jones's motion to suppress notes, the police had that information (i.e., that he lived on the second floor of 232 Westland Street) independently from three other sources: the police's own internal database, LexisNexis, and a confidential informant. *See Jones*, 2014 WL 1154480, at *3, 11.  Moreover, that statement and the other statements that he made – that he hadn't seen Rivera that day and that Jones did not have anything on the third

27

floor – paled in significance next to the other material in the search warrant affidavit and the large volume of evidence against Jones. *See id.* at \*10-12. As a result, even if they were omitted from the affidavit, these statements would not have affected my findings of probable cause; similarly, there is no realistic prospect that the exclusion of these statements at trial would have affected the verdict. Further, to the extent Jones makes an ineffective assistance of counsel claim based on these allegations, it was not ineffective for counsel not to pursue evidence of Jones's request to speak to his lawyer because it would not have made a difference in the Court's upholding of the search warrant or in the verdict and, for the same reason, there is no prejudice under the *Strickland* prejudice prong. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

\* \* \*

Thus, I find that Jones's Section 2255 motion must be dismissed because he has failed to state a plausible Fourth Amendment claim, Fifth Amendment claim, or ineffective assistance of counsel claim under the Sixth Amendment, and because of the overwhelming evidence of Jones's guilt. *See United States v. Seiser*, 112 F.3d 507 (2d Cir. 1996) ("A district judge considering a section 2255 motion can rely on [his] personal familiarity with the case and dismiss the habeas claim without a hearing if []he finds that the petition lack[s] any truly meritorious allegation and there is overwhelming evidence of [petitioner's] guilt." (internal quotation marks omitted) (brackets in original)). Accordingly, an evidentiary hearing, appointment of counsel, and Rule 6 discovery are not warranted because Jones has not "set forth specific facts supported by competent evidence, raising detailed and controverted issues that, if proved at a hearing, would entitle [Jones] to relief", *Gonzalez,* 722 F.3d at 130 (internal quotation marks and citations omitted), and because he has not "establish[ed] . . . that he has a

plausible claim of ineffective assistance of counsel . . .", *Puglisi*, 586 F.3d at 213 (internal quotation marks omitted).

## V.      CONCLUSION

For the reasons set forth above, Jones's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is DENIED.

IT IS SO ORDERED.

_____<br>
/s/<br>
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                January 29, 2021